**In Re Jack EMERT and Robert D. Lundberg, Appellants.**

**No. 96–1559.**

United States Court of Appeals, Federal Circuit.

Sept. 18, 1997.

Lawrence F. Scinto, Fitzpatrick, Cella, Harper & Scinto, New York City, argued, for appellants. With him on the brief was Dominick A. Conde. Of counsel on the brief were Kenneth R. Walton, Exxon Chemical Company, Linden, NJ, and Harvey L. Cohen.

Scott A. Chambers, Associate Solicitor, Office of the Solicitor, Department of Commerce, Patent and Trademark Office, Arlington, VA, argued, for Commissioner. With him on the brief were Nancy J. Linck, Solici-

tor, Albin F. Drost, Deputy Solicitor, and Craig R. Kaufman, Associate Solicitor.

Before MAYER, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

Jack Emert and Robert D. Lundberg (collectively Emert) appeal the rejection of claims 1–5 and 43–67 of application No. 07/250,887 ('887 application). The United States Patent and Trademark Office's Board of Patent Appeals and Interferences (Board) rejected Emert's contested claims for obviousness-type double patenting. Recognizing that the Board applied the correct test and reached the proper result under the correct standard of review, this court affirms.

## I.

This case arises from an interference between Emert's '887 application and Beverwijk et al.'s U.S. Patent No. 5,873,004. Beverwijk conceded that Emert was the first to invent the subject matter of the interference. Rather than claim priority, Beverwijk asserted that obviousness-type double patenting should prevent Emert from gaining a patent. The Administrative Patent Judge denied Beverwijk's motion for judgment. On appeal, the Board reversed the APJ and rejected Emert's claims in the absence of a terminal disclaimer. Specifically, the Board held that Emert's undue delays in prosecution caused the '624 patent to issue first. Therefore, the Board employed a one-way obviousness analysis comparing the application with the '624 patent. Under this analysis, the Board denied issuance to Emert's application. Instead, the Board required Emert to file a terminal disclaimer limiting his patent term.

The application and patents involved in this action disclose polymer dispersants. These dispersants, when added to motor oil, keep engines clean by preventing particles from settling on engine surfaces. In July 1985, Emert made the first filing of importance at the United States Patent and Trademark Office (PTO) for this case. At that time, Emert filed an application, assigned to Exxon, that later matured into U.S. Patent No. 4,863,624 ('624 patent). This patent claims:

1. An oil soluble dispersant mixture useful as an additive comprising:

(A) from about 10 to 90 weight percent of a first dispersant comprising (a) a first hydrocarbyl substituted $C_4$ to $C_{10}$ monounsaturated dicarboxylic acid producing material formed by reacting a first olefin polymer of $C_2$ to $C_{10}$ monoolefin having a number average molecular weight of about 1500 to 5,000 and a first $C_4$ to $C_{10}$ monounsaturated acid material, said first acid producing material having an average of 1.05 to 1.25 dicarboxylic acid producing moieties, per molecule of said first olefin polymer present in the reaction mixture used to form said first acid producing material, and (b) a first nucleophilic reactant selected from the group consisting of amines, alcohols, amino-alcohols and mixtures thereof; and

(B) from about 90 to 10 weight percent of a second dispersant comprising (a) a second hydrocarbyl substituted $C_4$ to $C_{10}$ monounsaturated dicarboxylic acid producing material formed by reacting a second olefin polymer of $C_2$ to $C_{10}$ monoolefin having a ... number average molecular weight of about 700 to 1150 and a second $C_4$ to $C_{10}$ monounsaturated acid material, said acid producing material having an average of 1.2 to 2.0 dicarboxylic acid producing moieties, per molecule of said second olefin polymer present in the reaction mixture used to form said second acid producing material, and (b) a second nucleophilic reactant selected from the group consisting of amines, alcohols, amino-alcohols and mixtures thereof.

In short hand, the '624 patent claims: "An oil soluble dispersant mixture useful as an additive comprising: [A and B]." Emert added component B to his disclosure as part of a continuation-in-part application filed on September 9, 1987. In September 1989, the '624 patent issued to Emert and two other inventors.

On October 16, 1986, Emert filed the first of a series of applications, also assigned to Exxon, that became the contested '887 application. In July 1987, the PTO rejected all

claims of this first application for obviousness. Rather than respond to the obviousness rejection, Emert waited six months—the maximum period—then abandoned that first application and filed a substantially identical continuation application. Again, in March 1988, the PTO rejected this continuation for obviousness. Again Emert did not respond to the merits of the rejection, but waited the maximum six-month period and filed still another continuation. This second continuation—the '887 application—was again substantially identical to the original filing.

In November 1988, the examiner determined that the '887 application contained multiple inventions and imposed a restriction requirement. Emert responded to the restriction requirement on May 11, 1989. On July 28, 1989, the examiner rejected Emert's elected claims for obviousness. Emert finally responded to the merits on February 1, 1990. This action later ensued. The '887 application claims:

An oil soluble dispersant useful as an oil additive comprising the product of a reaction mixture comprising:

(a) a hydrocarbyl substituted $C_4$ to $C_{10}$ monounsaturated dicarboxylic acid producing material formed by reacting olefin polymer of $C_2$ to $C_{10}$ monoolefin having a number average molecular weight of about 700 to 1200 and a $C_4$ to $C_{10}$ monounsaturated acid material, said acid producing material having an average of about 1.3 to 1.8 dicarboxylic acid producing moieties, per molecule of said olefin polymer present in the reaction mixture used for forming said acid producing material; and

(b) a nucleophilic reactant selected from the group consisting of amines, aminoalcohols and mixtures thereof.

In short hand, the '887 application claims: "An oil soluble dispersant useful as an oil additive comprising the product of a reaction mixture comprising: [$B_1$]." As to the relation between B and $B_1$, the dispersant claimed in the '624 patent [B] has a molecular weight of 700—1150 compared with 700—1200 in $B_1$ of the '887 application. The '624 patent's B also has a functionality ratio of 1.2—2.0 compared with 1.3—1.8 in $B_1$ of the '887 application. Emert claims that these very slight differ-

ences minimize interactions with other oil additives.

On appeal, Emert claims the Board made numerous errors in rejecting the claims for obviousness-type double patenting. First, Emert argues that the Board erred by declining to use a *two*-way obviousness-type double patenting analysis. Specifically, Emert faults the Board's finding that his delays slowed the prosecution of his application and caused the '624 patent to issue ahead of the '887 application. Second, Emert argues that even under a one-way analysis the Board erred because it did not provide a proper evidentiary basis for the finding of obviousness.

## II.

A rejection under the doctrine of double-patenting is a legal conclusion to which this court gives complete and independent review. *See In re Goodman,* 11 F.3d 1046, 1052, 29 USPQ2d 2010, 2015 (Fed.Cir. 1993). The ultimate determination of whether a one-way or two-way analysis is appropriate is also a question for the court. However, the PTO made factual findings underlying its decision to use a one-way analysis. This court reviews these underlying factual findings for clear error. *See In re Caveney,* 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed.Cir.1985). In this case, the parties do not contest the applicable dates, but rather the conclusion to be drawn from those dates—specifically, Emert's responsibility for delays in the prosecution of the '887 application.

## III.

An obviousness-type double patenting rejection prevents applicants from extending their patent term beyond statutory limits where an application claims merely an obvious variant of the claims in a prior patent. *See Goodman,* 11 F.3d at 1052; *In re Vogel,* 57 C.C.P.A. 920, 422 F.2d 438, 441, 164 USPQ 619, 622 (1970). Thus, this court examines the claims to determine whether one defines merely an obvious variation of the other. "Without a patentable distinction—because the pending claim defines merely an obvious variation of the patented claim—the patentee may overcome the double patenting

rejection [only] by filing a terminal disclaimer." *Goodman*, 11 F.3d at 1052.

This court has set forth two tests for obviousness-type double patenting rejections. In *In re Braat*, 937 F.2d 589, 593, 19 USPQ2d 1289, 1292 (Fed.Cir.1991), the court applied a "two-way" patentability test. In that case, the applicant filed two applications, the second of which issued first due to the PTO's unjustified delays in the prosecution of the earlier filed application. This court also noted that the assignee could not have included the claims of the later-filed Dil application in the Braat application.* *Id.* at 593–94. Because "applications for basic and improvement patents should not be penalized by the rate of progress of the applications through the PTO, a matter over which the applicant does not have complete control," this court applied a two-way obviousness analysis. *Id.* at 593. Under the two-way analysis, this court examined each claim to determine whether it was an obvious variant of the other, rather than just examining the application claim for patentable distinctiveness from the patent claim. Although the Dil patent had issued before the pending Braat application, the court determined that the Dil claims were "patentably distinct from the subject matter defined by the claims of Braat." *Id.* at 594. Under this two-way analysis, therefore, this court reversed the Board's double patenting rejection.

In *Goodman*, this court set forth the "one-way" test for obviousness-type double patenting. In that case, the applicant chose to file a continuation for a broad claim while seeking early issuance of a narrow species claim. *Goodman*, 11 F.3d at 1053. This court noted that this election could gain the patentee "an extension of the term on a species when the broad genus later issued." *Id.* Therefore, because PTO action did not dictate the rate of prosecution, this court looked only to see if the pending application claims were patentably distinct from the issued patent. Under this one-way test, this court upheld the Board's double patenting rejection. *Id.* at 1053–54.

In the instant case, Emert had significant control over the rate of prosecution of the application. The '887 application was filed on October 16, 1986, and initially rejected on July 21, 1987. Emert's subsequent actions had a direct effect on the pace of prosecution. First, Emert received numerous time extensions in various filings. More importantly, after the obviousness rejection in July 1987, Emert waited six months and twice filed a substantially similar continuation application. *See Goodman*, 11 F.3d at 1053 (noting that patentee's election to file a continuation in lieu of seeking an immediate appeal was evidence of patentee's control over the pace of prosecution). Emert did not make a substantive response to the PTO for more than two years after the original rejection. In the meantime, the '624 patent issued. During the critical three-year co-pendent period of the '887 application and the application for the '624 patent, Emert was responsible for the delays in prosecution.

## IV.

■ Because Emert orchestrated the rate of prosecution for the two applications, this court applies a one-way analysis. Generally, the court must determine whether the claims in the application define an obvious variation of the claim in the earlier issued patent. *See, e.g., General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278, 23 USPQ2d 1839, 1843 (Fed.Cir.1992). Even under this analysis, Emert argues that the invention claimed in the '887 application is not obvious in light of the '624 patent.

■ Herein, the parties disagree about the characterization of the relation between the two claims. Emert insists that the claims stand in a combination ('624 patent) and sub-

---

* Similarly, this court noted that an applicant could not have added Braat's claims to the Dil application. *In re Braat*, 937 F.2d 589, 593–94, 19 USPQ2d 1289, 1292–93 (Fed.Cir.1991). The applicants, Braat and Dil, both filed their applications before the 1984 Amendments to the Patent Act. After the 1984 Amendments, joint inventorship became possible even if "each [inventor] did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116(3) (1994). In this case, both the Emert–Lundberg ('887) application and the Emert–Waddoups–Lundberg ('624 patent) application came after the 1984 Amendments and could have been combined. Indeed the applicants did include the B dispersant within the '624 patent after its initial filing.

combination ('887 application) relationship. The PTO insists that the claims stand in a genus ('887 application) and species ('624 patent) relationship. Because a genus is *anticipated* by a species, the PTO argues that the invention claimed in the application is per se obvious. *See Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707, 716, 223 USPQ 1264, 1271 (Fed.Cir.1984) ("anticipation is the epitome of obviousness"). In spite of the parties' eagerness to conform the round-peg facts of the case into semantic, square holes, the critical inquiry remains whether the claims in the '887 application define an obvious variation of the invention claimed in the '624 patent. *See also* 3 Donald S. Chisum, *Patents,* § 9.03[2][b][iii] ("In situations in which the element or subcombination issues after the combination, the matter should be analyzed as one of a generic claim issuing after a later filed specific or improvement claim.").

The '624 patent and the '887 application claim slightly different oil soluble dispersants. In the claims to the dispersant A + B, and $B_1$, B and $B_1$ contain 3 slightly different limitations: the average molecular weight of the starting polymer (700–1150 v. 700–1200), the average number of dicarboxylic acid producing moieties per molecule of the olefin polymer (1.2–2.0 v. 1.3–1.8), and the group of nucleophiles used in the reaction mixture (the '887 application omits alcohols from the Markush group). The only limitation in the '887 application that is slightly broader than the invention of the '624 patent is the molecular weight of the polymer starting material.

The Board treated the chemical mixtures B and $B_1$ as if they were equivalent or identical. Indeed, Emert argues that the patent and the application stand in a combination/subcombination relationship, effectively conceding that the differences between B and $B_1$ are not material and would have been obvious to a person having ordinary skill in the art. Hence the '887 application's claimed invention, an oil soluble dispersant comprising $B_1$, while not anticipated by the '624 patent due to the slight modification of three claim limitations, would have been prima facie obvious in light of the claim to the combination [A and B].

Without Emert providing rebuttal evidence, this prima facie case of obviousness must stand. Although Emert included some new subject matter that might have been patentable had it been separately claimed, the broad claims Emert sought in the '887 application would have been obvious in view of the prior art '624 patent. Absent some indication of unexpected properties, the combination [A and B] rendered $B_1$ obvious.

## V.

In the absence of a terminal disclaimer, all of the claims at issue in the '887 application are unpatentable under the doctrine of double patenting. For the reasons stated above, this court affirms the decision of the Board.

*AFFIRMED.*